**Donna Jane WATTS, Plaintiff,**

v.

**CITY OF HOLLYWOOD, FLORIDA; and Keith Wadsworth, Defendants.**

CASE NO. 15–61123–CIV–ALTONAGA/O'Sullivan

United States District Court, S.D. Florida.

Signed 11/17/2015

Mark E. Tietig, Tietig & Tietig, P.A., Merritt Island, FL, for Plaintiff.

Daniel L. Abbott, Kelly Rains Jesson, Weiss Serota Helfman Cole & Bierman, P.L., Fort Lauderdale, FL, for Defendant, City of Hollywood, FL.

## ORDER

CECILIA M. ALTONAGA, DISTRICT JUDGE

**THIS CAUSE** came before the Court upon Defendant, City of Hollywood's (the "City['s]") Motion to Dismiss ... ("Motion") [ECF No. 13], filed August 18, 2015. On September 9, 2015, Plaintiff, Donna Jane Watts ("Plaintiff" or "Watts") filed a Response ... ("Response") [ECF No. 31], to which the City filed a Reply ... ("Reply") [ECF No. 36] on September 18, 2015. The Court has carefully considered the parties' written submissions, the Complaint [ECF No. 1], and applicable law.

## I. BACKGROUND [1]

This case stems from an incident that took place on October 11, 2011, during which Plaintiff, a Trooper with the Florida Highway Patrol ("FHP"), pulled over and cited an off-duty City of Miami police officer, Officer Fausto Lopez ("Lopez"), for reckless driving. (*See* Compl. ¶ 9). Plaintiff had observed Lopez driving erratically and at a speed of 120 miles per hour in a 70 mile per hour zone. (*See id.*). For more than seven minutes, "Lopez failed or refused to pull over in compliance with the siren and flashing lights" on Plaintiff's patrol car. (*Id.*).

Plaintiff's citation of Lopez was highly publicized throughout the State, "and many law enforcement officials publicly

1. When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir.1997).

and personally took umbrage for Trooper Watts's law enforcement action against Officer Lopez." (*Id.* ¶ 10). Within a month of Plaintiff's citation of Lopez, "numerous threats were posted online, purportedly by law enforcement officers," directed at both Trooper Watts and other members of the FHP; FHP officers "began being pulled over without cause by other law enforcement officers;" and Plaintiff was threatened if a situation occurred where back-up was needed by her or other FHP officers, law enforcement back-up would not be provided, "thereby putting her health, safety, and life at much greater risk than otherwise." (*Id.* ¶ 11). In addition, Plaintiff received hang-up telephone calls on her unlisted home and cellular phones, as well as pizza deliveries she never ordered (*see id.* ¶ 12); was subjected to abuse and threats on law enforcement websites (*see id.*); and "observed numerous marked police and suspicious vehicles stopped at or very near her house for no apparent legitimate reason" (*id.*).

Plaintiff owned one or more vehicles registered with the State of Florida Department of Highway Safety and Motor Vehicles ("DHSMV") and held a Florida driver's license issued by the DHSMV. (*See id.* ¶ 6). To obtain her driver's license and register her vehicles, Plaintiff was required to, and did, provide the DHSMV with personal information. (*See id.* ¶ 7). Plaintiff's personal information was entered into a computer database of motor vehicle records maintained and administered by the DHSMV, which includes records pertaining to motor vehicle operators' permits; motor vehicle titles and registrations; color photographs; social security numbers; places and dates of birth; and prior and current home and mailing addresses. (*See id.* ¶ 8). The DHSMV and Florida Department of Law Enforcement made Plaintiff's personal information available to law enforcement personnel throughout Florida through the Driver and Vehicle Information Database ("DAVID") system. (*See id.*).

On January 19, 2012, in response to the threats and harassment, Plaintiff contacted the DHSMV inquiring whether law enforcement officers were viewing her private information. (*See id.* ¶ 14). On April 3, 2012, after counsel for Plaintiff contacted the DHSMV to inquire about the delay in providing the requested information, the DHSMV gave Plaintiff some of the reports from the DAVID system. (*See id.*). Plaintiff learned "between October 2011 and January 19, 2012, well over 88 law enforcement officers from 25 different agencies had viewed her private driver's license information more than 200 times." (*Id.* ¶ 15).

Plaintiff alleges the City "(actually or constructively) knowingly allowed and facilitated at least four instances of obtaining, disclosing, and/or using Trooper Watts's personal information from a motor vehicle record on the DAVID system, for a purpose not permitted under the DPPA [Driver's Privacy Protection Act]." (*Id.* ¶ 16 (alterations added)). "On at least one occasion, Defendant Keith Wadsworth," an employee with the City, "knowingly obtained, disclosed, and/or used Trooper Watts's personal information from a motor vehicle record on the DAVID system, for a purpose not permitted under the DPPA." (*Id.* ¶ 17; *see also id.* ¶ 5). At no time did Plaintiff "provide her consent for anyone to obtain, disclose, or use . . . her private information for anything but legitimate law enforcement business." (*Id.* ¶ 20 (alteration added)).

In December 2012, Plaintiff originally filed a single case against over 100 defendants, including the City and Wadsworth. *See Watts v. City of Palm Beach Gardens, et al.,* Case No. 12–cv–81406–DMM. In

May 2014, the court dismissed the action without prejudice as to all defendants except for the Town of Juno Beach. (*See id.* Order on Mots. to Dismiss [ECF No. 658]). Plaintiff thereafter filed separate actions against the remaining defendants, several of which are concurrently proceeding in this District. *See Watts v. City of Miami, et al.,* Case No. 15–cv–21271–RNS; *Watts v. Village of Biscayne Park, et al.,* Case No. 15–cv–21291–KMW; *Watts v. City of Miami Beach, et al.,* Case No. 15–cv–21292–RNS; *Watts v. Broward Cnty. Sheriff, et al.,* Case No. 15–cv–61112–WJZ; and *Watts v. City of Port St. Lucie, et al.,* Case No. 15–cv–14192–RLR.

On May 28, 2015, Plaintiff filed her Complaint against the City and Wadsworth in his individual capacity (*see* Compl. ¶ 5), pursuing the following causes of action: Count I against the City and Wadsworth for violation of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. sections 2721 *et seq.* (*see id.* 1); Counts II and III against the City and Wadsworth, respectively, for unlawful searches and breaches of privacy, brought pursuant to 42 U.S.C. section 1983 (*see id.* 5, 7); Count IV against the City and Wadsworth for common law invasion of privacy (*see id.* 8); Count V against the City for common law negligent supervision (*see id.* 9); and Count VI against the City for negligent training (*see id.* 10).[2]

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Although this pleading standard "does not require 'detailed factual allegations,' ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, 129 S.Ct. 1937 (alteration added) (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

## III. ANALYSIS

The City argues Watts's claims against it should be dismissed for several reasons. The City first argues the DPPA, invasion of privacy, and negligent supervision claims should be dismissed because Watts does not adequately allege Wadsworth acted within the scope of his employment, and therefore the City cannot be held vicariously liable. (*See* Mot. 4–9). The City also contends the invasion of privacy claim should be dismissed for three additional reasons: (1) drivers have no reasonable expectation of privacy in their driver's license records; (2) Watts does not allege an intrusion into her "private quarters;" and (3) she does not sufficiently allege the claimed intrusions on her privacy were highly offensive. (*See id.* 13–16). Next, the City avers the negligent super-

---

**2.** On September 4, 2015, the Court denied Wadsworth's Motion to Dismiss and Motion to Strike ... [ECF No. 9]. (*See* Order [ECF No. 29]).

vision claim should be dismissed for the additional reason the Complaint contains no allegations the City was on notice of Wadsworth's unfitness. (*See id.* 16–17). The City argues the negligent training claim fails because the Complaint does not identify any relevant training program or policy. (*See id.* 17). Finally, the City contends Watts fails to plead a claim for municipal liability under section 1983 due to pleading deficiencies and fatal misapprehensions of the law. (*See id.* 9–13).

## A. Scope of Employment

Watts seeks to hold the City vicariously liable for violation of the DPPA, invasion of privacy, and negligent supervision based on the allegedly harmful acts of its employees, including Wadsworth. (*See* Compl. Counts I, IV, V). According to the City, however, she does not adequately allege the employees committed the wrongful acts within the scope or course of their employment. (*See* Mot. 4–9).

### 1. Vicarious Liability Standards

■ The DPPA "regulates the disclosure of personal information contained in the records of state motor vehicle departments." *Thomas v. George,* 525 F.3d 1107, 1109 (11th Cir.2008) (quoting *Reno v. Condon,* 528 U.S. 141, 143, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000)). "One section of the DPPA prohibits disclosures of personal information by a state's department of motor vehicles and any officer, employee, or contractor thereof, *see* 18 U.S.C. § 2721(a),[3]

while a separate section provides a private cause of action against persons who knowingly obtain, disclose, or use personal information from a motor vehicle record, *see* 18 U.S.C. § 2724(a)." *Id.* (brackets and footnote added). "[N]ot all obtainment, disclosure, or use of personal information from motor vehicles is wrongful. In § 2721(b), the DPPA provides fourteen 'permissible uses,'" *id.* (alteration added), including, for example, "use by any government agency, including any court or law enforcement agency, in carrying out its functions...." 18 U.S.C. § 2721(b)(1) (alteration added).

The DPPA private right of action imposes liability on "person[s]." *Id.* § 2724(a) (alteration added). The statutory definition of "person" has a carve-out for states and their agencies, but the definition is otherwise broad enough to cover municipalities. *See id.* § 2725(2) ("'[P]erson' means an individual, organization or entity, but does not include a State or agency thereof." (alteration added)); *see also Santarlas v. Minner,* No. 5:15–cv–103–Oc-30PRL, 2015 WL 3852981, at *3 (M.D.Fla. June 22, 2015) ("*Santarlas I*") (citing *Margan v. Niles,* 250 F.Supp.2d 63, 75 (N.D.N.Y.2003)). Yet, the plain language of the DPPA contemplates liability of a municipality only when the municipal entity itself commits an act in violation of the statute. Watts does not bring her DPPA claim against the City for anything the City itself did; rather, she claims the City

---

**3.** Section 2721(a) states:

In general—A State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity:

(1) personal information ... about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section; or

(2) highly restricted personal information ... about any individual obtained by the department in connection with a motor vehicle records, without the express consent of the person to whom such information applies, except uses permitted in subsections (b)(1), (b)(4), (b)(6), and (b)(9)....

*Id.* (alterations added).

is vicariously liable for its employees' violations of the DPPA.

■ The statutory text of the DPPA says nothing explicit about whether a municipality can be held vicariously liable for the acts of its employees, and the Eleventh Circuit has not addressed the issue. Nevertheless, in a well-reasoned opinion, a court in the Northern District of New York found the DPPA implicitly recognizes a *respondeat superior* theory of liability against municipalities. *See Margan,* 250 F.Supp.2d at 72–75. Other federal courts nationwide have adopted that court's reasoning. *See, e.g., Schierts v. City of Brookfield,* 868 F.Supp.2d 818, 822 (E.D.Wis.2012); *Menghi v. Hart,* 745 F.Supp.2d 89, 99 (E.D.N.Y.2010). The Court follows their lead here; indeed, the parties do not suggest otherwise.

■ The next question is how exactly the Court discerns whether an employee's alleged DPPA violations trigger vicarious liability. There is a lack of binding precedent on this issue as well, but the Court is again not without guidance from another district court. In *Santarlas I,* the court raised the issue of how a city may be held vicariously liable for its employees' DPPA violations. *See* 2015 WL 3852981, at *4. The court first assumed, as a general matter, "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Id.* (quoting *Meyer v. Holley,* 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003)). Those rules provide, "to hold an employer vicariously liable for the acts of its employees, the acts must have been taken within the employee's scope of employment." *Id.* (citing *Meyer,* 537 U.S. at 285, 123 S.Ct. 824 (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 756, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998))). The court further

found "[a]n employee is acting within the scope of his or her employment when the 'employee's purpose, however misguided, is wholly or in part to further the master's business.'" *Id.* (quoting *Burlington Indus.,* 524 U.S. at 756, 118 S.Ct. 2257) (alteration added). Applying the standard laid out in *Santarlas I,* the Court evaluates the DPPA claim to determine whether Watts alleges the City employees acted with the purpose of furthering the City's business.

Watts's invasion of privacy claim against the City is subject to a similar "scope of employment" limitation. The claim is premised on an "intrusion" theory of "physically or electronically intruding into one's private quarters." *Agency for Health Care Admin. v. Associated Indus. of Fla., Inc.,* 678 So.2d 1239, 1252 n. 20 (Fla.1996), *receded from in part on other grounds, Jews For Jesus, Inc. v. Rapp,* 997 So.2d 1098, 1113–14 (Fla.2008). Florida law recognizes two other varieties of invasion of privacy—(1) appropriation and (2) public disclosure of private facts—but Watts does not invoke either of these theories. *See Agency for Health Care Admin.,* 678 So.2d at 1252 n. 20; *see also Jews For Jesus,* 997 So.2d at 1113–14.

■ In contrast with the federal DPPA, Florida law expressly addresses the circumstances under which a municipality may be subject to vicarious liability. Florida Statute section 768.28—the statute governing waiver of sovereign immunity—provides:

The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wan-

ton and willful disregard of human rights, safety, or property.

FLA. STAT. § 768.28(9)(a). Florida courts find "[a]n employee's conduct is within the scope of his employment, where (1) the conduct is of the kind he was employed to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master." *Iglesia Cristiana La Casa Del Señor, Inc. v. L.M.*, 783 So.2d 353, 357 (Fla. 3d DCA 2001) (alteration added; citation omitted); *see also Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467 So.2d 748, 750 (Fla. 1st DCA 1985) ("The 'course and scope of employment' test for liability of the private and the public employer are essentially the same." (citing *City of Miami v. Simpson*, 172 So.2d 435, 437 (Fla.1965))).

■ The City argues Watts's negligent supervision claim [4] is subject to the same "scope of employment" limitation that applies to the invasion of privacy claim. Under Florida law, "[n]egligent supervision occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *Dep't of Envtl. Prot. v. Hardy*, 907 So.2d 655, 660 (Fla. 5th DCA 2005) (alteration added) (citing *Garcia v. Duffy*, 492 So.2d 435, 438–39 (Fla. 2d DCA 1986)). The City argues because Wadsworth was not acting within the course and scope of his employment when he accessed Watts's information in DAVID, the negligent supervision claim

fails for the same reason the DPPA and invasion of privacy claims fail. (*See* Mot. 4–9).

■ The City erroneously conflates the "course of employment" element of the negligent supervision claim with the "course of employment" element of the vicarious liability standard for DPPA and invasion of privacy claims. Closer examination of the negligent supervision theory of liability, including a comparison of the negligent supervision cause of action to the negligent hiring cause of action, clarifies the distinction:

> The principal difference between negligent hiring and negligent retention as bases for employer liability is *the time at which the employer is charged with knowledge of the employee's unfitness.* Negligent hiring occurs when, *prior to the time the employee is actually hired,* the employer knew or should have known of the employee's unfitness, and the issue of liability primarily focuses upon the adequacy of the employer's pre-employment investigation into the employee's background. Negligent retention, on the other hand, occurs when, *during the course of employment,* the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment.

*Duffy,* 492 So.2d at 438–39 (emphasis added; citations omitted). The "course of employment" element of the negligent supervision claim thus refers to a particular period of time, whereas the "course of employment" element of the vicarious lia-

---

4. The terms "negligent supervision" and "negligent retention" are essentially interchangeable. *See Grimm v. City of Boca Raton,* No. 15–80608–CIV–MARRA, 2015 WL 4483974, at *8 (S.D.Fla. July 22, 2015) (citing *Mercado v. City of Orlando,* 407 F.3d 1152, 1162 (11th Cir.2005)).

bility standard refers to a realm or sphere of conduct, not a timeframe. ·

■ The distinction is intuitive, as a negligent supervision claim is not premised on vicarious liability; rather, the action triggering liability for negligent supervision is the employer's own decision to retain a dangerous employee. The liability is direct, not vicarious. By contrast, in a vicarious liability context, the employee's wrongful conduct imposes liability on the employee, but the employer's mere status as employer—rather than any wrongful conduct it undertakes—subjects the employer to liability as well. *See Mallory v. O'Neil,* 69 So.2d 313, 315 (Fla.1954). In light of the foregoing, the "scope of employment" aspect of the City's challenge to the negligent supervision claim is unavailing.

### 2. Analysis

Before addressing the "scope of employment" arguments levelled against the DPPA and invasion of privacy claims, the Court first rejects the City's argument—made without any supporting legal authority—that Watts must name the other City employees besides Wadsworth who allegedly accessed her information in DAVID. (*See* Mot. 6 n.4). It is true Watts does not identify the other employees involved in the "at least four instances" of improper DAVID access (Compl. ¶¶ 16–17), but the Court declines to require Watts to plead the employees' names when the claims at issue are brought against the City rather than against the employees.

The Court next turns to the three prongs of the "scope of employment" analysis: "(1) the conduct is of the kind [the employee] was employed to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part

by a purpose to serve the [employer]." *Iglesia Cristiana,* 783 So.2d at 357 (alterations added). The City's attack focuses on the Complaint's allegations Wadsworth acted for an impermissible or unlawful purpose. With respect to the first prong of the analysis, the City argues the Complaint does not allege Wadsworth's conduct was the type of conduct he was hired to perform because his alleged access of Watts's information for an impermissible purpose could not possibly be considered one of his duties. (*See* Mot. 6–7). For the third prong, the City likewise argues the Complaint fails to allege Wadsworth acted with the purpose of serving the City's interest, given the numerous allegations Wadsworth accessed Watts's information for an impermissible purpose. (*See id.* 7–8).

■ The City's arguments distort the inquiry. Florida law does not ignore the common-sense idea municipal employees would not be hired to do something illegal, nor would their illegal acts presumptively be in furtherance of their employer's interests. Nevertheless, the Florida Supreme Court long ago explained an employee may act within the scope of his employment "even though the wrongful act also constitutes a crime ... or was not authorized by, or was forbidden by, the employer, or was not necessary or appropriate to serve the interests of the employer...." *Stinson v. Prevatt,* 84 Fla. 416, 94 So. 656, 657 (1922) (alterations added; citations omitted). "Thus, conduct may be within the scope of employment, even if it is unauthorized, if it is of the same general nature as that authorized or is incidental to the conduct authorized." *Hennagan,* 467 So.2d at 750 (citation omitted).

The Eleventh Circuit has recognized this as well, explaining in the related context of a section 1983 claim:

We recognize that one might reasonably believe that violating someone's constitutional rights is never a job-related function or within the scope of a police officer's employment. However, the question of whether a defendant acted within the scope of his employment is distinct from whether the defendant acted unconstitutionally. The scope-of-employment inquiry is whether the employee police officer was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the officer's scope of authority (i.e., job-related duties) and in furtherance of the employer's business.

*Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir.2010) (footnote call number omitted). To frame the issue as the City urges would open a huge gap in *respondeat superior* liability, if not eviscerate it.

The Court thus considers, for the first prong, whether the general activity Wadsworth is alleged to have undertaken fell within his job-related duties, not whether he was allowed to engage in the particular unlawful conduct. The Complaint explains law enforcement personnel use the DAVID system for law enforcement purposes (*see* Compl. ¶¶ 8, 13); although the Complaint does not specify Wadsworth is anything but an "employee" (*id.* ¶ 5), it is entirely plausible use of the DAVID system falls within his job-related duties given he allegedly knows how to use DAVID to retrieve information (*see id.* ¶ 17).

For the third prong, the Court determines whether the allegations support a plausible inference Wadsworth acted in furtherance of the City's interests, even if

his actions were "excessive or misguided." *Iglesia Cristiana,* 783 So.2d at 356 (citations omitted); *see also Andersen v. United States,* No. 09–60364–CIV, 2009 WL 6633307, at *5 (S.D.Fla. Oct. 21, 2009) (finding, under the "purpose" prong, a court discerns whether there is a "relationship between the employee's wrong and the employer's interests" (citing *Forster v. Red Top Sedan Serv., Inc.,* 257 So.2d 95, 96 (Fla. 3d DCA 1972); *Columbia By The Sea, Inc., v. Petty,* 157 So.2d 190 (Fla. 2d DCA 1963))). In support of its argument, the City cites *Casey v. City of Miami Beach,* 789 F.Supp.2d 1318 (S.D.Fla.2011), but that case was decided based on the distinguishable line of precedent dealing with vicarious liability of municipalities for their police officers' sexual assaults. *See id.* at 1321 (citation omitted). Likewise, the holding in *Garcia v. City of Hollywood,* 966 So.2d 5 (Fla. 4th DCA 2007), another case the City relies on, was premised on an equally distinguishable line of precedent concerning the transit to and from work of police officers operating "take-home" vehicles. *See id.* at 6–8 (citations omitted). Those cases are inapposite.[5]

*Santarlas I* is more on point. In that case, the court stated it was "likely" law enforcement employees did not act with the purpose of serving their employer because they allegedly accessed DAVID for an improper purpose. 2015 WL 3852981, at *5 (citation omitted). This is the same argument the City makes here, but, as explained, the reasoning underlying the argument does not square with Florida law. At any rate, this commentary in *Santarlas I* was *dictum,* purely a side issue which the court raised *sua sponte*

---

5. The court in *Garcia* did suggest an officer must be "engaged in the prevention or detection of crime or the enforcement of the penal, criminal, traffic, or highway laws of the State" in order to trigger vicarious liability for the City, 966 So.2d at 7 (internal quotation marks omitted), but the use of DAVID plausibly falls within Wadsworth's duties, irrespective of any abuse or misuse he committed while using DAVID.

and which the parties had not addressed in their briefing. *See id.* at *4–5.

Nonetheless, the court that decided *Santarlas I* issued another opinion in the same case a few months later. *See Santarlas v. Minner,* No. 5:15–cv–103–Oc–30PRL, 2015 WL 5896243 (M.D.Fla. Oct. 7, 2015) ("*Santarlas II*"). In that more recent iteration, the "scope of employment" issue was again raised, this time by the parties. The plaintiff argued "because the City was entrusted with the information contained within DAVID and provided access to DAVID to its employees, it can be held vicariously liable for any of its employee's actions i[n] misusing DAVID to obtain Plaintiff's personal information." *Id.* at *2 (alteration added). The court rejected that argument, explaining "[t]he mere fact that the individual defendants had access to DAVID through their employment with the City is insufficient to establish that the conduct was actuated by a purpose to serve the employer." *Id.* (alteration added; citation omitted). As the plaintiff alleged no other basis for attributing the requisite motive to the officers, the court found the complaint failed to allege the officers acted within the scope of their employment. *See id.*

■ Like the plaintiff in *Santarlas II,* Watts seems to attribute to Wadsworth a motive to serve the City merely because Wadsworth had access to DAVID through his employment with the City. (*See* Resp. 2). This overly broad argument fails, as it did in *Santarlas II,* because it does not account for the obvious possibility an employee could use an employer's resources for entirely personal reasons.

Additionally, and more importantly, like the complaint in *Santarlas II,* the Complaint here fails to allege any other facts that might give rise to a plausible inference Wadsworth, or any other City employee, acted in furtherance of the City's

interests. In her Response, Watts relies on the following allegations:

5. [Wadsworth], at all times relevant to this lawsuit, is an employee with the City of Hollywood, and is being sued in an individual capacity.

\* \* \*

16. The City of Hollywood (actually or constructively) knowingly allowed and facilitated at least four instances of obtaining, disclosing, and/or using Trooper Watts's personal information from a motor vehicle record on the DAVID system, for a purpose not permitted under the DPPA.

17. On at least one occasion, [Wadsworth] knowingly obtained, disclosed, and/or used Trooper Watts's personal information from a motor vehicle record on the DAVID system, for a purpose not permitted under the DPPA.

\* \* \*

19. By the actions described above, the City's employees were acting within the course and scope of their employment when they obtained, disclosed or accessed Trooper Watts' personal information from the DAVID system for an unlawful purpose.

\* \* \*

52. The invasions of privacy and other unlawful acts against Trooper Watts by the City's employees was committed within the course and scope of their duties as agents and employees of the City.

53. The invasions of privacy and other unlawful acts against Trooper Watts by the City's employees was perpetrated under the authority of The City and/or

in (at least partial) furtherance of The City's interests.

(Compl. ¶¶ 5, 16, 17, 19, 52, 53 (alterations added); *see also* Resp. 1–4). These allegations are vague and conclusory and thus cannot support an inference rising above speculation.

The most specific the Complaint gets on this question is actually paragraph 10, which Watts does not cite: "Trooper Watts's citing of Officer Lopez was highly publicized throughout the state, and many law enforcement officials publicly and personally took umbrage for Trooper Watts's law enforcement action against Officer Lopez." (Compl.¶ 10). But even this allegation is vague, as it is not clear in whose interest the "many law enforcement officials"—presumably including Wadsworth and the other City employees—took umbrage. Was it in their own interest, perhaps a sign they will retaliate against Watts or any other law enforcement officer who attempts to hold their conduct to the same standards applied to ordinary citizens? Was it in Lopez's interest, perhaps a way of showing solidarity with a colleague and sending an implicit message further prosecution of Lopez would result in more severe retaliation? Or was it in the City's interest, an implicit acknowledgement prosecution of City officers for similar (or worse) offenses would damage the City's reputation, and hence such "ratting out" or "snitching" on fellow officers must be nipped in the bud?

One can easily see how Watts could claim Wadsworth and the other City employees acted in the City's interest (however excessive or misguided their actions may have been), but the necessary allegations are missing from the Complaint. In her Response, Watts explains her position

in more detail (*see* Resp. 3), but a legal memorandum in response to a motion to dismiss cannot cure a defective complaint. In other words, a complaint must stand on its own, but here, the Complaint's allegations are not adequately specific to give rise to the plausible—not merely possible—inference Watts asks the Court to make. Nevertheless, the defect appears fixable; accordingly, Watts will have the opportunity to amend the DPPA claim asserted in Count I.[6]

Addressing the second prong—whether "the conduct occurs substantially within the time and space limits authorized or required by the work to be performed"— the City points out Watts does not allege "when and where Wadsworth was when [he] purportedly accessed her information." (Mot. 7 (alteration added)). With respect to the "when" question, the Complaint alleges the impermissible incidents of access occurred between October 2011 and January 19, 2012. (*See* Compl. ¶ 15). Regarding the "where" question, the Complaint alleges: Watts's information was available through DAVID; DAVID is available to law enforcement personnel throughout Florida; the City facilitates its employees' access to DAVID; and Watts obtained reports from DHSMV indicating City employees, including Wadsworth, accessed her information on DAVID. (*See id.* ¶¶ 7, 8, 13–17). As DAVID is not a publicly available resource, it is certainly plausible, given the aforementioned allegations, Wadsworth accessed Watts's information while on or in City property, such as at a police station or in a police vehicle. Perhaps Wadsworth could add an allegation to this effect to tighten up the Complaint; at any rate, the Court has already

---

6. Although this aspect of the common law invasion of privacy claim also appears curable, that claim is dismissed with prejudice on other grounds, as explained in the next section of the analysis.

granted leave to amend the DPPA claim to the extent it is based on vicarious liability.

## B. Invasion of Privacy

As indicated, Watts's invasion of privacy claim is premised on the "intrusion" theory of "physically or electronically intruding into [her] private quarters." *Agency for Health Care Admin.*, 678 So.2d at 1252 n. 20 (alteration added). The City argues the claim should be dismissed with prejudice because: (1) drivers have no reasonable expectation of privacy in their driver's license records; (2) Watts does not allege an intrusion into her "private quarters;" and (3) she does not sufficiently allege the claimed intrusions on her privacy were highly offensive. (*See* Mot. 13–16; *see also* Reply 8–9).

In support of the first argument, the City cites two cases finding, under Minnesota common law, there is no right to privacy in driver's license information of the kind protected by the DPPA. *See Bass v. Anoka County*, 998 F.Supp.2d 813, 825 (D.Minn.2014); *Rasmusson v. Chisago County*, 991 F.Supp.2d 1065, 1077–79 (D.Minn.2014). The City also cites three cases within the Eleventh Circuit finding, as a matter of federal constitutional law, no right to privacy in the same sort of information. *See Collier v. Dickinson*, 477 F.3d 1306, 1308 (11th Cir.2007) (citing *Pryor v. Reno*, 171 F.3d 1281, 1288 n. 10 (11th Cir.1999), *rev'd on other grounds*, 528 U.S. 1111, 120 S.Ct. 929, 145 L.Ed.2d 807 (2000)); *Ela v. Orange Cnty. Sheriff's Office*, No. 6:13–cv–491–Orl–28KRS, 2014 WL 325697, at *7 (M.D.Fla. Jan. 29, 2014); *Johansson v. Emmons*, No. 6:09–cv–2053–Orl–19KRS, 2010 WL 457335, at *5 (M.D.Fla. Feb. 4, 2010). The City does not bother to explain how these cases applying Minnesota common law and federal constitutional law translate into the context of Florida common law, and the Court

declines to engage in that exercise for it. *Cf. Spilfogel v. Fox Broad. Co.*, 433 Fed. Appx. 724, 726–27 (11th Cir.2011) (noting party's failure to explain how federal constitutional privacy jurisprudence and a sister state's common law privacy jurisprudence square with Florida's common law privacy jurisprudence).

In any event, the lack of guidance in those areas is of no moment, as the City's second and third arguments hit the mark. The Florida Supreme Court explained, for an intrusion-based claim of invasion of privacy, "[t]he intrusion to which this refers is into a 'place' in which there is a reasonable expectation of privacy," and "the focus is the right of a private person to be free from public gaze." *Allstate Ins. Co. v. Ginsberg*, 863 So.2d 156, 162 (Fla.2003) (alteration added). The Eleventh Circuit has thus interpreted Florida law as requiring "an intrusion into a private place and not merely into a private activity." *Spilfogel*, 433 Fed.Appx. at 727. Applying this framework, the court in *Bradley v. City of St. Cloud*, No. 6:12–cv–1348–Orl–37TBS, 2013 WL 3270403 (M.D. Fla. June 26, 2013), found the defendants' accessing of the plaintiff's medical records at a hospital and without her authorization did not constitute an intrusion into a "place" protected by the right to privacy. *See id.* at *4–5.

The City's accessing of Watts's driver's license information in the DAVID system is likewise not an intrusion into a "place." Watts's attempt to liken the archiving of her information in DAVID to the keeping of personal effects in a home safe or desk drawer is both unsupported and unpersuasive. (*See* Resp. 8). Similarly, Watts's argument "her privacy was invaded electronically, and included the private information about her physical domains of home and vehicle" (*id.*), like most of her Response, is not supported by a single citation to legal authority other than

a footnote reciting the general legal standard.

■ Assuming Watts somehow pleaded an intrusion into a "place," she also must plausibly allege the accessing of her information "is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" *Stoddard v. Wohlfahrt,* 573 So.2d 1060, 1062 (Fla. 5th DCA 1991) (quoting *Ponton v. Scarfone,* 468 So.2d 1009, 1011 (Fla. 2d DCA 1985); *Kent v. Harrison,* 467 So.2d 1114, 1115 (Fla. 2d DCA 1985)). Watts's subjective reaction, however distraught she may have been, does not control the analysis; rather, she must demonstrate, as a matter of law, and "as objectively as is possible, [that the alleged misconduct] is 'atrocious, and utterly intolerable in a civilized community.'" *Stoddard,* 573 So.2d at 1062 (alterations added; citations omitted).

As case law applying Florida law reveals, this is an onerous standard. For example, in *Neeley v. Wells Fargo Financial, Inc.,* No. 8:12–cv–542–T–33AEP, 2012 WL 5949106 (M.D.Fla. Nov. 28, 2012), the court found a badgering stream of belligerent and belittling debt-collection telephone calls did not satisfy the standard. *See id.* at *1, 5. In a less severe but factually more analogous case, *Stasiak v. Kingswood Co-Op, Inc.,* No. 8:11–cv–1828–T–33MAP, 2012 WL 527537 (M.D.Fla. Feb. 17, 2012), the court found a company's access of a couple's credit reports years after the couple gave the company permission to do so in connection with the purchase of an apartment did not satisfy this standard either. *See id.* at *3 (citing *Oppenheim v. I.C. Sys., Inc.,* 695 F.Supp.2d 1303, 1306, 1310 (M.D.Fla.2010); *Boyles v. Mid–Florida Television Corp.,* 431 So.2d 627, 636 (Fla. 5th DCA 1983)).

■ Here, too, Wadsworth's access of Watts's information—information which she voluntarily provided to the DHSMV—

cannot, as a matter of law, be said to be "atrocious, and utterly intolerable in a civilized community," nor is Wadsworth's access "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." Watts contends her status as a female law enforcement officer "subject to stalking and retribution" (Resp. 9) compels a finding to the contrary, but again, Watts cites not one case or other source of legal authority in support of her argument.

Given the rigorous legal standard for asserting an invasion of privacy claim under Florida law, there is no indication here more adequate pleading can save Watts's claim. Consequently, Count IV is dismissed with prejudice, but only to the extent it is asserted against the City.

## C. Negligent Supervision

■ To adequately plead a negligent supervision claim, Watts must allege facts showing the City had constructive or actual notice that Wadsworth or the other relevant City employees were unfit for the work for which they were hired. *See Iglesia Cristiana,* 783 So.2d at 358 (citing *M.V. v. Gulf Ridge Council Boy Scouts of Am., Inc.,* 529 So.2d 1248 (Fla. 2d DCA 1988)). The City avers the Complaint does not make this showing. (*See* Mot. 16–17). In response, Watts points to the following allegations:

58. At all times relevant, the City had a duty to adequately and properly supervise its employees to prevent harm to others, including to Trooper Watts.

59. The City breached its duty by failing to adequately and properly supervise its employees to prevent harm, including invasion of privacy arising therefrom, to Trooper Watts.

60. It was foreseeable that The City's failure to adequately and properly su-

pervise its employees would result in the invasions of privacy and other harm against Trooper Watts.

61. As a direct and proximate result of The City's breach of its duty to adequately and properly supervise its employees, Trooper Watts was injured and has suffered damages.

(Compl. ¶¶ 58–61).

■ As with any other claim asserted in federal court, conclusory allegations do not suffice to satisfy the notice element of a negligent supervision claim; specific facts must be alleged. In this case, those facts must support a plausible inference the City had actual or constructive notice its employees "had 'harmful propensities'—prior to the incident at issue here— or w[ere] otherwise unfit to serve." *Polanco v. City of Marco Island*, No. 2:10–cv–605–FtM–29DNF, 2011 WL 2848655, at *2 (M.D.Fla. July 19, 2011) (quoting *Willis v. Dade Cnty. Sch. Bd.*, 411 So.2d 245, 246 n. 1 (Fla. 3d DCA 1982)) (alteration added); *see also Campbell v. Humphries*, 353 Fed.Appx. 334, 336 (11th Cir.2009) (explaining why allegations in support of a negligent retention claim failed "to meet the rigorous standard for supervisory liability in this circuit"); *Santarlas II*, 2015 WL 5896243, at *3.[7] Watts's allegations in support of this claim are vague and conclusory, but more detailed factual allegations could potentially cure these defects. Accordingly, Count V is dismissed without prejudice for Watts to correct these pleading deficiencies in an amended complaint.

## D. Negligent Training

■ "Under Florida law, an employer is liable in tort for reasonably foreseeable damages resulting from the negligent training of its employees and agents."

*Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1265 (11th Cir.2001) (citing *McFarland & Son, Inc. v. Basel*, 727 So.2d 266 (Fla. 5th DCA 1999)). To survive a motion to dismiss, Watts must adequately plead the City "was negligent in the implementation or operation of [a] training program. [She] cannot merely challenge the content of the program." *Mercado*, 407 F.3d at 1162 (alterations added).

■ The City argues the Complaint contains no allegations identifying any relevant training program or policy. (*See* Mot. 17). In response, Watts cites paragraphs 65 through 71 of the Complaint (*see* Resp. 11), but the allegations in these paragraphs are wholly conclusory (*see* Compl. ¶¶ 65–71). Watts also contends her allegation the City allowed and facilitated its employees' unlawful accessing of her information "strongly implies a very faulty implementation of training." (Resp.10). The allegation does nothing of the sort: based on this reasoning, every time an employer allowed an employee to do something wrong or otherwise facilitated, however unintentionally, an employee's wrongful act, the employer would be liable for failure to train the employee. The negligent training cause of action is not this broad; instead, Watts must identify a training program or policy and explain specifically how the City was negligent in implementing it. While she has not done so, again there is no indication an attempt to do so would be futile. Thus, Count VI is also dismissed without prejudice for Watts to re-plead it.

## E. Municipal Liability Under Section 1983

Count II consists of various section 1983 claims rolled into one, with each claim

---

7. Watts's argument "the City is presumed to know of the DPPA restrictions" (Resp.10) is thus not responsive to the issue, which is the City's notice of its employees' unfitness, not its notice of the law.

presenting an alternative theory of municipal liability against the City. The Court divides its analysis into two parts. The first part addresses the federal rights Watts claims the City violated: the constitutional right to be free from unreasonable searches and seizures, the constitutional right to privacy, and the statutory right to privacy under the DPPA. (*See* Compl. ¶¶ 30–32). The second part addresses the theories of municipal liability on which Watts premises her claims: the general "widespread custom" theory, the "failure to train" theory, and the "single incident" exception. (*See id.* ¶¶ 34–36). The City attacks Watts's claims on all of these fronts. (*See* Mot. 9–13). Before turning to the analysis, however, the Court reviews the *Monell* analytical framework.

### 1. *Monell* and Its Progeny

 Under section 1983, a municipality cannot be held liable on a theory of *respondeat superior,* but it may be held liable for its own, independent violations of federal law. *See Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 691, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Local governing bodies, therefore, can be sued directly under [section] 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. 2018 (alterations added; footnote call number omitted). A municipality may also be sued for violations of federal rights "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91, 98 S.Ct. 2018. Such a custom must be "so persistent and widespread as to practically have the force of law." *Connick v.*

*Thompson,* 563 U.S. 51, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (citations omitted). Thus, to demonstrate a *Monell* claim, the plaintiff must show: (1) the violation of a federal right occurred; (2) the existence of a municipal policy or custom; and (3) a causal connection between the violation and the municipal policy or custom. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

 In addition to this broader theory of section 1983 municipal liability, a plaintiff may invoke the narrower "failure to train" theory of liability, although the circumstances giving rise to such liability are quite limited: a plaintiff must show "deliberate indifference to the rights of persons with whom the [municipal employees] come into contact." *Id.* at 388, 109 S.Ct. 1197 (alteration added; footnote call number omitted). To show "deliberate indifference," "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.1998) (citations omitted). The Eleventh Circuit "repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Id.* at 1351 (citations omitted). Indeed, "[w]ithout notice that a course of training is deficient *in a particular respect,* decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick,* 131 S.Ct. at 1360 (emphasis and alteration added). Additionally, the deficient training of one officer is not sufficient to meet this standard; rather, the deficiency must be widespread and closely related to the

plaintiff's injury. *See Canton*, 489 U.S. at 390–91, 109 S.Ct. 1197.

There is yet another, even narrower theory of section 1983 municipal liability, although it remains more of a hypothetical exception to the rule: "the 'single-incident' liability" originally hypothesized in *Canton*. *Connick*, 131 S.Ct. at 1360–61. As the Supreme Court explained, this potential exception to the rule seeks "not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 1361.

### 2. Federal Rights Invoked

Watts claims the City violated her right to be free from unreasonable searches and seizures under the DPPA and under the Fourth Amendment, as applied to the states by the Fourteenth Amendment. (*See* Compl. ¶¶ 30, 32). She also claims the City violated her right to privacy under the DPPA and under the Fourth, Fifth, Ninth, and Fourteenth Amendments. (*See id.* ¶¶ 31, 32). The City contends Watts's claims fail as a matter of law to the extent they are premised on violations of her constitutional right to privacy and on unreasonable searches. (*See* Mot. 10 n.8).

■ First, Watts's section 1983 claim against the City is dismissed with prejudice to the extent it is premised on a violation of her purported federal constitutional right to privacy in her driver's license information. Eleventh Circuit precedent squarely forecloses that argument, as there is no constitutional right to privacy in the sort of information protected by the DPPA. *See Ela*, 2014 WL 325697, at *7 (citing *Collier*, 477 F.3d at 1308; *Pryor*, 171 F.3d at 1288 n. 10).

■ Watts also argues the access of her driver's license information violated her constitutional and (purported) DPPA right to be free from unreasonable searches and seizures. While there is no Eleventh Circuit precedent on all fours, two well-reasoned decisions by courts in the Middle District of Florida held a third party's access of information in DAVID—even for an impermissible purpose—is not a search, nor does such an action impinge on a reasonable expectation of privacy. *See Ela*, 2014 WL 325697, at *7 (citations omitted); *Johansson*, 2010 WL 457335, at *5 (citations omitted). Watts cites no authority to the contrary other than a citation to the "penumbra" language of *Griswold v. Connecticut*, 381 U.S. 479, 484–85, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and the Seventh Circuit's discussion of the legislative history of the DPPA in *Senne v. Village of Palatine, Illinois*, 695 F.3d 597, 607 (7th Cir.2012) (en banc), which does not get her far. (*See* Resp. 6–7). The Court adopts the reasoning of the *Ela* and *Johansson* opinions with respect to this issue and concludes Watts's section 1983 claim fails as a matter of law insofar as it is based on a violation of her constitutional and (purported) DPPA right to be free from unreasonable searches and seizures. This aspect of her section 1983 claim against the City is therefore dismissed with prejudice.

The remaining federal right in which Watts attempts to ground her section 1983 claim is the right to privacy created by the DPPA. This statutory right is indeed enforceable under section 1983. *See Collier*, 477 F.3d at 1311. The City does not contest this right is cognizable for a section 1983 claim as a general matter, but it argues Watts fails to adequately plead a section 1983 claim enforcing the right under any theory of municipal liability the Complaint raises. (*See* Reply 8). The Court thus turns to that final issue.

### 3. Theories of Liability Asserted

██ As explained, Watts asserts three theories of section 1983 liability against the City: the general "widespread custom" theory, the "failure to train" theory, and the "single incident" exception. As for the general "widespread custom" theory, the Complaint alleges:

> The City's violation of Trooper Watts's rights is due to the City's policy or custom of allowing its employees to invade the privacy of, and/or conduct unreasonable searches against, people in whom the employees have an unofficial interest, including to unlawfully obtain, disclose, and/or use personal information from DAVID.

(Compl.¶ 34). This naked, conclusory assertion is supported by no more than the allegation of the four instances of improper DAVID access by City employees. (See id. ¶¶ 16, 17). This is not enough to satisfy the pleading standard on a Rule 12(b)(6) motion to dismiss, as Watts is required to allege specific facts detailing a widespread policy or custom, not just a couple of incidents and a conclusory assertion. See Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1329–30 (11th Cir. 2015) (citing Iqbal, 556 U.S. at 678, 129 S.Ct. 1937; Twombly, 550 U.S. at 557, 127 S.Ct. 1955). Watts does, of course, allege "between October 2011 and January 19, 2012, well over 88 law enforcement officers from 25 different agencies had viewed her private driver's license information more than 200 times." (Compl.¶ 15). While this seems like a widespread problem in the aggregate, she can attribute only four incidents of improper access to this particular City (see id. ¶¶ 16, 17); under the Monell standard, the "widespread custom" must be the City's own custom. See Weiland, 792 F.3d at 1329 n. 21.

Watts also attempts to rely on a "failure to train" or "failure to supervise" theory, as well as the "single incident" exception. In support, she alleges:

> 35. Additionally or alternatively, the City is negligent in training and/or supervising its employees who participated in the violation of Trooper Watts's right to be free from unreasonable searches and invasions of privacy because the City failed to adequately train and/or supervise its employees to handle recurring situations presenting an obvious potential for such violation.
>
> 36. In light of the duties of protecting citizens against denials of the right to be free from unreasonable searches and invasions of privacy, the need for more or different training and/or supervision is and has been so obvious that the City is deliberately indifferent to the need for such training.

(Compl.¶¶ 35, 36). These allegations, like many other allegations the Court has addressed in this Order, are conclusory. They alone cannot satisfy Watts's pleading burden.

Watts does, however, point to her allegation the City "(actually or constructively) knowingly allowed and facilitated at least four instances" of improper DAVID access of her information. (Id. ¶ 16). This conclusory allegation goes to the "notice" requirement of the "failure to train" standard, but to state a claim, Watts must allege the City was on notice prior to the incidents forming the basis of her claim. See Weiland, 792 F.3d at 1329 & n.21. No such prior notice is stated.[8]

---

8. Watts argues "the City is presumed to have knowledge of the DPPA and its restrictions on access" (Resp.5), but the "notice" element of the "failure to train" cause of action is notice of a particular problem among a municipality's employees, not notice of the law in general. If the latter were the case, the "notice"

There are still other pleading deficiencies. The Complaint does not contain any allegations describing a particular training program, let alone allegations highlighting why such a training program is defective and how the defect is a widespread problem. It does not allege, in the alternative, the City provided no training at all. Even assuming Watts did adequately plead the City was on notice, she does not adequately allege the City made a deliberate choice not to take any action in response. Finally, Watts does not allege in her Complaint (or argue in her Response) how the need to train was so obvious that the "single incident" exception should apply in the absence of prior notice.

It is well known municipal liability under section 1983 is hard to establish. The test is purposefully difficult, lest a loosening of the standard effectively create a *respondeat superior* regime of liability—something *Monell* and its progeny expressly sought to avoid. *See Gold*, 151 F.3d at 1351 n. 10 (citations omitted). Watts simply might not know enough to adequately plead her claims against the City, and she cannot proceed with only conclusory allegations. All the same, the futility of pleading a section 1983 claim based on a violation of her rights under the DPPA is not certain—at least not yet—and so the Court gives Watts one last chance to plead her claim against the City, failing which Count II will be dismissed with prejudice in its entirety.

## IV. CONCLUSION

Notwithstanding the serious nature of the allegations raised, the Complaint contains critical pleading deficiencies and is premised on certain fatal misapprehensions of the law. Nevertheless, it appears at least certain aspects of the Complaint requirement arguably would always be satisfied.

are capable of being cured. For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Motion [ECF No. 13] is **GRANTED in part.** Count IV is dismissed with prejudice to the extent it is asserted against the City. With respect to the other counts against the City, Watts has until **November 25, 2015** to file an amended complaint addressing the potentially curable deficiencies outlined in this Order, failing which Counts II, V, and VI will be dismissed with prejudice and Count I will be dismissed with prejudice to the extent it is asserted against the City.

**DONE AND ORDERED** in Miami, Florida, this 17th day of November, 2015.